1  **WO**

2

3

4

5

6

7                IN THE UNITED STATES DISTRICT COURT

8               FOR THE DISTRICT OF ARIZONA

9

10

11

12  FINOVA Capital Corporation,    )
                                   )
13                  Plaintiff,     )    No. CIV 02-1277-PHX RCB
                                   )
14          Vs.                    )        O R D E R
                                   )
15  Richard A. Arledge, Inc.,      )
    d/b/a Arledge Motor Co.,       )
16  et al.,                        )
                                   )
17                  Defendants.    )
    _____    )

18

19       This action was commenced on July 10, 2002, when Plaintiff

20  FINOVA Capital Corporation ("FINOVA") filed a complaint against

21  Defendants Richard A. Arledge, Inc., d/b/a Arledge Motor Co.

22  ("AMC"), et al., in this matter.  Complt. (doc. 1).  Thereafter, on

23  October 4, 2002, Defendants filed their Answer and Counterclaim.

24  (doc. 42).  FINOVA asserts breach of contract claims against

25  Defendants and seeks recovery of a deficiency owed by AMC under a

26  loan contract and by the Arledges as the guarantors of such loan

27  contract.  Pretrial Order (doc. 231).  AMC and the Arledges rely

28  upon the following affirmative defenses: Waiver, Release, Estoppel,

1  Prior breach, Excuse of Performance, Unclean hands, Set off,

2  Payment, Accord and satisfaction, Impairment of collateral, Failure

3  of consideration, Usury, Unconscionability, Fraud, and Prior Course

4  of Dealing and Course of Performance.  Id.  Furthermore, AMC and

5  the Arledges contend that FINOVA committed a prior material breach

6  of the loan contract, which excused their further performance and

7  was a producing cause of their damages.  Id.

8     On April 30, 2004, FINOVA filed a motion for summary judgment

9  on all the matters in this case.  (doc. 133).  That same day,

10 Defendants filed a cross-motion for summary judgment.  (doc. 135).

11 On August 25, 2004, the Court entered an order granting partial

12 summary judgment in this action in favor of Plaintiff.  Order (doc.

13 167).  However, the Court noted that a determination as to who was

14 responsible for monitoring the "minimum net cash flow covenant"

15 ("MNCFC") remained at issue.  Id. at 29.

16    On April 11 through April 18, 2006, a bench trial was

17 conducted on the remaining issues in this matter.  Min. Entry (doc.

18 257).  At the bench trial, documentary evidence was presented and

19 the court heard testimony from witnesses for both parties.  Having

20 reviewed the evidence presented, the court now makes its findings

21 of fact and conclusions of law.

22 **I. FINDINGS OF FACT**

23    FINOVA is a Delaware corporation, with its principal place of

24 business in Maricopa County, Arizona.  AMC is a Texas corporation

25 with its principal place of business located in Dallas County,

26 Texas.  Richard A. Arledge ("Arledge") and Peggy L. Arledge are

27 husband and wife and reside in Collin County, Texas.  The amount in

28 controversy in this action, exclusive of interest and costs, is in

-2-

1 | excess of $75,000.

2 |     FINOVA is a commercial finance company, which, at the time of

3 | the events in question, provided commercial financing to companies

4 | like AMC.  At the time of the events in question, AMC was in the

5 | business of selling and leasing (and financing the sale and leasing

6 | of) used automobiles.  Arledge is the president of AMC.

7 |     From June 17, 1992 to December 14, 1995, AMC obtained

8 | financing from TransAmerica, a commercial finance company.  On or

9 | about October 17, 1995, TransAmerica notified AMC that it was in

10 | violation of the "interest coverage ratio" contained in AMC's loan

11 | documents with TransAmerica.  The "interest coverage ratio" was not

12 | curable.  Sometime in October 1995, Arledge contacted Steve

13 | Cammack, the former Credit Division Manager for TransAmerica and

14 | the Division Manager of the Rediscount division for FINOVA, at all

15 | relevant times in this litigation to inquire if FINOVA would be

16 | able to extend financing to AMC.  Cammack was involved with the

17 | negotiations of the loan, loan terms, loan agreements and documents

18 | with AMC.

19 | **A. Agreements and Contracts Between FINOVA and Defendants**

20 |     On December 14, 1995, FINOVA, as lender, and AMC, as borrower,

21 | executed and delivered: (a) a Loan and Security Agreement and a

22 | Schedule to the Loan and Security Agreement dated December 14, 1995

23 | (collectively, the "Original Loan Agreement"); and (b) a Promissory

24 | Note (the "Original Note") (collectively the "Initial Loan

25 | Documents").  The Initial Loan Documents provided AMC a revolving

26 | line of credit of $3,000,000.  Pursuant to and contemporaneously

27 | with the execution of the Initial Loan Documents, the Arledges

28 | executed and delivered to FINOVA a document entitled "Guaranty

- 3 -

1  (Continuing/Unlimited)" (the "Guaranty"), which guaranteed to

2  FINOVA the payment and performance by AMC of all its loan

3  obligations under the Initial Loan Documents.  The Original Loan

4  Agreement contained a "net income" covenant, which was designed to

5  determine whether AMC had a positive net income on its income

6  statements.

7       On October 21, 1999, AMC executed a document entitled "Fourth

8  Amended and Restated Promissory Note" in the principal amount of

9  $10,000,000, which superceded the Original Note.  At that time, the

10 Original Loan Agreement was amended by the Ninth Amended and

11 Restated Schedule to the Loan and Security Agreement (the "Ninth

12 Amendment").  The Ninth Amendment introduced, in place of the "net

13 income" covenant, the "minimum net cash flow covenant" ("MNCFC") to

14 the Loan Agreement.  The MNCFC was retained in the "Tenth Amended

15 and Restated Schedule to Loan and Security Agreement" (the "Loan

16 Agreement"), which was acknowledged by the Arledges as guarantors.

17      The MNCFC is set forth in Section 6.2(K) of the Loan

18 Agreement, which requires that AMC not "[a]llow the Net Cash Flow

19 to be less than One Dollar ($1.00) for the period of

20 determination," with the term "Net Cash Flow" defined under Section

21 1.40 of the Loan Agreement as follows:

22          NET CASH FLOW. The term "Net Cash Flow" shall
            mean, for the twelve (12) month period immediately
23          preceding any date of determination, as reflected
            on the financial statements of Borrower supplied
24          to Lender pursuant to Section 4.4 hereof, the sum
            of the following: (i) all cash receipts,
25          including, but not limited to, collections of
            Receivables and Leases, down payments, trade-ins
26          on sales and repossession recoveries, less (ii)
            all cash expenses, including cost of goods sold
27          (with the cost of goods sold with respect to the
            Leases to be calculated at Cost Ratio multiplied
28          by the total gross liquidations of Receivables and

                              -4-

1           Leases, including residual recovery from the
          Leases, for the period of determination).

2

3 (Exbt. 108).   AMC was responsible for providing FINOVA with the

4 documents and information requested by FINOVA to determine the Net

5 Cash Flow.

6      Pursuant to the Loan Agreement, FINOVA agreed to provide AMC

7 with a loan facility not to exceed $10,000,000 for the financing of

8 (1) AMC's purchase of motor vehicle inventory and (2) loans and

9 leases arising from the marketing of such inventory.   Section

10 2.3(C) of the Loan Agreement established that the term of the loan

11 was due to expire on September 30, 2004.

12      Under Section 2.2 of the Loan Agreement, interest was to

13 accrue on the principal balance of the amounts advanced under the

14 Loan Agreement at the "Stated Interest Rate," which is equal to

15 three percent (3%) in excess of:

16         ...the "Prime" rate publically announced by
        Citibank N.A., New York, New York (or such other

17         "money center" bank as [FINOVA], in its sole
        discretion, may select from time to time, but

18         shall not be more than the highest rate of the
        five largest banks in the Continental United

19         States as their respective corporate base,
        reference, prime or similar benchmark rate),

20         provided however, that such rate may not be the
        lowest rate charged to such bank's customers.

21

22 (Exbts. 102, 108).   AMC was obligated under Section 2.3 of the Loan

23 Agreement to make monthly payments of accrued interest to FINOVA.

24      In addition to the obligations of maintaining a positive cash

25 flow and making monthly interest payments, AMC had numerous other

26 obligations under the Loan Agreement, including the obligation to

27 make principal payments of all loan "overadvances."   Section 2.5 of

28 the Loan Agreement provides that AMC was required to immediately

1  cure any loan overadvance (i.e., the amount by which the loan

2  balance exceeds the limits under the Loan Agreement) by making full

3  payment of the amount of such overadvance.

4      Section 1.10 of the Loan Agreement defines "Default" as "an

5  event which with the passage of time or notice or both would

6  constitute an 'Event of Default' (as defined in Section 7.1)."

7  Section 7.1 of the Loan Agreement sets forth numerous events that

8  would constitute Events of Default, including those set forth in

9  Section 7.1(A) and Section 7.1(B).  Section 7.1(A) addresses

10 monetary events, providing that an Event of Default shall arise

11 "[i]f any payment of principal or interest or any other amount due

12 Lender is not paid within five (5) days after the same shall be due

13 and payable."  Section 7.1(B), referring to non-monetary events,

14 provides that an Event of Default arises:

15         If [AMC] or [Arledge] fails or neglects to
           perform, keep or observe any of the terms,
16         provisions, conditions or covenants, contained in
           this Agreement, any of the other Loan Documents or
17         any other agreement or document executed in
           connection with the transactions contemplated by
18         this Agreement or if any representation, warranty
           or certification made by [AMC] herein or in any
19         certificate or other writing delivered pursuant
           hereto shall prove to be untrue in any material
20         respect as of the date upon which the same was
           made or at any time thereafter, and the same is
21         not cured to Lender's satisfaction within ten (10)
           days after Lender has given written notice to
22         [AMC] identifying such default.

23 (Exbt. 102).  Pursuant to Section 2.9(i) of the Loan Agreement,

24 FINOVA was not obligated to make loan advances to AMC where a

25 "Default or Event of Default shall have occurred."  Id.

26     All of AMC's payment and other obligations under the Loan

27 Agreement are secured by collateral in which FINOVA was granted a

28 first priority security interest (collectively, the "Collateral"),

1  including but not limited to the following:

2       A.    All Receivables and Leases and all accounts,
3             chattel paper, instruments, contract rights
           and general intangibles, all of [AMC's]
4             right[s], remedies, security, liens,
           guaranties,...all deposits or other security
5             or support for the obligation of any Account
           Debtor thereunder...;

6       B.    All inventory, new or used, including parts
           and accessories;
7

8       C.    All equipment, new or used, including but not
           limited to vehicles on lease or held for
           lease and all parts and accessories;
9

     D.    All bank accounts of [AMC];
10

11       E.    All monies, securities and property, now or
           hereafter held, received by, or entrusted to,
           in the possession or under the control of
12             [FINOVA] or a bailee of Lender;

13       F.    All accessions to, substitutions for all
           replacements, products and proceeds of the
14             foregoing, including, without limitation,
           proceeds of insurance policies referenced in
15             [clause "A"] above (including but not limited
           to claims paid and premium refunds); and
16

17       G.    All books and records (including, without
           limitation, customer lists, credit files,
           tapes, ledger cards, computer software and
18             hardware, electronic data processing
           software, computer printouts and other
19             computer materials and records) of [AMC]
           evidencing or containing information
20             regarding any of the foregoing.

21  (Exbt. 102) at 8.  On or about December 20, 1999, FINOVA, AMC and

22  Arledge, as custodian, entered into an Agency and Custodian

23  Agreement (the "Custodian Agreement"), which allowed Arledge, on

24  behalf of FINOVA, to retain physical possession of the car leases,

25  titles and other paper Collateral in which FINOVA was granted a

26  security interest.  (Exbt. 109).  In addition, on or about May 1,

27  2001, FINOVA, AMC and Arledge executed a document entitled

28  "Subordination and Standstill Agreement" (the "Subordination

1   Agreement").  (Exbt. 110).  Under the Subordination Agreement, AMC

2   and Arledge agreed that (a) all indebtedness presently existing or

3   ever arising and owing from AMC to Arledge was subordinated to

4   FINOVA in all rights to payment and in all other respects and (b)

5   upon FINOVA notifying Arledge of a Default under the Loan

6   Agreement, Arledge would "hold all payments of principal and

7   interest received from [AMC] in trust for the benefit of [FINOVA]."

8   Id. at 1.

9       AMC's account was managed by FINOVA's Rediscount Division

10  located in Dallas, Texas.  Jim Harris was the Account Executive

11  responsible for AMC's account in Dallas, Texas.  Matt Hall and Brad

12  Fisher were the Portfolio Managers responsible for AMC's account in

13  Dallas, Texas.  In or about late March to early April 2002, Harris,

14  Arledge, Jim Montgomery (AMC's accountant), Steven Thomas, Matt

15  Hall and Brad Fisher met at a Steak-n-Ale, a restaurant in Dallas,

16  Texas, to discuss matters relating to AMC's loan.  During this

17  meeting, Arledge was informed that AMC's account was being

18  transferred to FINOVA's Chicago office.  Ryan DeWitte became the

19  Account Executive responsible for AMC's account in Chicago.  Steve

20  Narsutis was the Vice President/Division Manager of FINOVA's office

21  in Chicago.

22      **B. MNCFC Issue**

23      As stated previously, one of AMC's obligations under the Loan

24  Agreement (as set forth under the MNCFC) was to ensure that the

25  company maintained a positive cash flow position from month to

26  month.  Based upon monthly financial statements provided by AMC,

27  FINOVA determined prior to May 7, 2002 that AMC was in violation of

28  the MNCFC for the months of February 2002 and March 2002.  Narsutis

1   and DeWitte met with Arledge on or about April 22, 2002 at AMC's

2   car lot and informed him that AMC was in violation of the MNCFC.

3        On May 7, 2002, FINOVA sent to AMC a formal written notice

4   (the "May 7 Default Notice") that AMC had violated the MNCFC for

5   February and March 2002.  The May 7 Default Notice also noted that

6   there was a violation of the MNCFC for January 2002, however FINOVA

7   later determined that there was no such violation.  FINOVA further

8   indicated in the May 7 Default Notice that such Defaults would

9   mature into Events of Defaults ten days thereafter.

10       After AMC's receipt of the May 7 Default Notice, Arledge asked

11  Ryan DeWitte, of FINOVA, to send to AMC's accountant, Jim

12  Montgomery, a copy of FINOVA's calculation of the MNCFC violation.

13  On May 17, 2002, DeWitte sent by e-mail to Montgomery a spreadsheet

14  setting forth the calculations upon which the May 7 Default Notice

15  was based.  Thereafter, there were a number of phone discussions

16  between DeWitte and Arledge with respect to the MNCFC issue. In one

17  such discussion, Arledge noted that FINOVA had made a mathematical

18  error in the calculations DeWitte had sent to him.  DeWitte agreed

19  and thus determined that there was no violation of the MNCFC for

20  January 2002.  However, violations still remained for February 2002

21  and March 2002.

22       Additionally, Arledge asked DeWitte if the money he invested

23  into AMC counted towards satisfaction of the MNCFC.  DeWitte

24  acknowledged that such money invested did count towards

25  satisfaction of the MNCFC, however the money Arledge withdrew from

26  AMC also must be accounted.  During this conversation, Arledge

27  asked what he could do to cure the default. DeWitte responded that

28  the default was not curable.

1    Between May 7, 2002 and May 17, 2002, Arledge called DeWitte

2  numerous times to discuss the MNCFC violation.  During these

3  conversations, Arledge asserted that, according to his own

4  calculation, AMC was not in default.  However, AMC refused to

5  provide such exonerating calculations to DeWitte for comparison.

6  Throughout the litigation of this lawsuit, Arledge and AMC

7  continued to refuse to provide such calculations based on attorney

8  client privilege and the work product doctrine.

9    In addition, during this time period Arledge offered to cure

10  the default, however FINOVA failed to give Arledge an amount of the

11  claimed violation.  DeWitte continued to tell Arledge that the

12  violation was not curable. Arledge made no cash payment or offer to

13  make a cash payment into AMC to "cure" the cash shortfalls.

14  However, Arledge asserts that he called DeWitte everyday to request

15  the exact amount required to cure.

16    After the passage of the ten-day cure period, Arledge

17  submitted to FINOVA revised financial statements wherein AMC

18  reclassified certain entries in an attempt to change the MNCFC

19  computation.  FINOVA disputed the accounting legitimacy of such

20  reclassifications, however, in any event, AMC was still in

21  violation of the MNCFC for February 2002 and March 2002 even if the

22  reclassifications were taken into account.  AMC eventually reverted

23  to its original financial statements.

24    Jim Harris, AMC's accountant, reviewed the calculation of the

25  MNCF and discovered that a number for October 2001 had been

26  inputted incorrectly.  As a result, AMC was not in default of the

27  MNCFC for the month of January 2002, and the numbers for the months

28  of February and March 2002 were reduced. Subsequently, DeWitte

1  reviewed the revised calculation of the MNCFC performed by Harris

2  and discovered additional errors in the calculation used to support

3  the May 7 Default Notice.  However, the calculations still

4  indicated that AMC was in violation of the MNCFC for February 2002

5  and March 2002.

6       On or about September 2004, Arledge realized that the

7  calculation prepared by Harris indicating that AMC had violated the

8  MNCFC did not include cash receipts, such as AMC's late fees, NSF

9  fees, security deposits, and repossession fees.  (Trial Transcript

10 for April 14, 2006) at 02:29:58PM-02:30:40PM.  In April 2005,

11 Arledge conducted a final calculation of the MNCFC for the

12 contested time period.  This calculation was ultimately provided to

13 FINOVA on May 6, 2005.

14      **C. Request to Sell Leases**

15      On or about May 20, 2002, Arledge requested that FINOVA allow

16 AMC to change its line of business from a used car dealership to a

17 new car dealership.  By letter dated May 20, 2002, Arledge sought

18 permission from FINOVA to sell off enough of the leases comprising

19 FINOVA's collateral in order to (a) pay down the debt owing to

20 FINOVA and (b) generate cash to "purchase a new car franchise."

21 Specifically, Arledge stated,

22          I AM REQUESTING FINOVA TO ALLOW ME TO SELL SOME OR
           ALL OF MY LEASES. THE MONIES GENERATED BY THIS
23          SALE WILL ENABLE ME TO PAY DOWN THE DEBT TO FINOVA
           AND GENERATE CASH, WHICH WILL ALLOW ME TO PURCHASE
24          A NEW CAR FRANCHISE.

25 (Exbt. 125).  Arledge maintains that this letter was a written

26 request for the exact amount that was needed to cure the Default.

27 It wasn't.  FINOVA never responded to Arledge's request.

28 . . .

1    **D. AMC's Requested Loan Advance**

2        On June 20, 2002, AMC sent to FINOVA a Request for Advance

3    Form, requesting an advance under the Loan Agreement in the amount

4    of $34,000 (the "Advance Request").  FINOVA responded to the

5    Advance Request the next day, on June 21, 2002.  In its response,

6    FINOVA (a) confirmed the continued existence of one or more

7    Defaults or Events of Default under the Loan Agreement, (b) refused

8    to fund the requested advance as a result, and (c) requested access

9    to AMC on June 26, 2002 for an audit.

10       **E. Requested Audit and Interest Payments**

11       On June 26, 2002, AMC denied FINOVA's auditor access for the

12   audit, which FINOVA requested and scheduled in its letter dated

13   June 21, 2002.  In response, FINOVA sent a letter to AMC's legal

14   counsel on June 26, 2002 (the "June 26 Default Letter"), advising

15   AMC that another Default had arisen under Section 3.6 of the Loan

16   Agreement as a result of AMC's failure to grant FINOVA access for

17   the audit.  The June 26 Default Letter further advised AMC that

18   such Default would mature into an Event of Default in ten days if

19   FINOVA was not granted access for the audit.  However, AMC did not

20   grant FINOVA access to conduct the audit.  Consequently, the

21   Default arising from AMC's refusal to grant FINOVA access for the

22   audit matured into an Event of Default on July 6, 2002.

23       AMC did not make any payments of loan interest to FINOVA in

24   June, July or August of 2002 because it believed that FINOVA had

25   already materially breached the Loan Agreement.  In July 2002,

26   Arledge took $330,000 out of AMC for his own use.  He withdrew an

27   additional $469,000 in August 2002.

28   . . .

1    **F. Filing of Lawsuit and Entry of First TRO**

2        On July 12, 2002, FINOVA sent to Arledge a letter formally

3    terminating the Custodian Agreement and demanding that Arledge

4    immediately deliver to FINOVA that portion of the Collateral for

5    which he had been entrusted as custodian.  Arledge refused to

6    deliver such collateral.  On July 15, 2002, FINOVA filed in this

7    action its Application for Temporary Restraining Order (With

8    Notice) and Order to Show Cause (the "First TRO Application").  In

9    the First TRO Application, FINOVA requested, among other things,

10   that (a) AMC be enjoined from interfering with FINOVA's audit

11   rights and (b) that Arledge be enjoined from interfering with

12   FINOVA taking possession of that portion of the Collateral that had

13   been entrusted to Arledge under the Custodian Agreement.  On July

14   17, 2002, the Court entered its Temporary Restraining Order (With

15   Notice) and Order to Show Cause (the "First TRO").  (doc. 5).

16   Pursuant to the First TRO, FINOVA was required to post a security

17   bond in the amount of $25,000.  Such bond was posted on July 19,

18   2002.

19       On July 26, 2002, FINOVA sent to AMC a notice of Default with

20   respect to AMC's failure to cure the overadvance existing as of

21   such date.  AMC had failed to pay any overadvance payments after

22   May 2002.  Thereafter, on August 16, 2002, FINOVA sent to AMC a

23   notice of Default with respect to AMC's failure to (a) cure the

24   overadvance existing as of that date and (b) make its interest

25   payments.  On that same date, FINOVA also sent a separate notice to

26   Arledge under the Subordination Agreement demanding that Arledge

27   remit to FINOVA all payments which he had received from AMC in

28   trust for the benefit of FINOVA.  Arledge refused to make any

1  payments to FINOVA and, instead, made payments to his personal

2  creditors, including $500,000 to his father, E.K. Arledge.

3      **G. FINOVA's Enforcement Efforts**

4      FINOVA pursued several enforcement options against AMC under

5  the loan agreement.  First, FINOVA enforced its rights under

6  Section 3.9 of the Loan Agreement.  On August 19, 2002, FINOVA made

7  a written demand upon AMC requesting that AMC deliver to FINOVA all

8  Collateral Proceeds thereafter received by or on behalf of AMC.

9  AMC refused to deliver such proceeds.  Thus, on September 10, 2002,

10  upon application of FINOVA, the Court entered its Supplemental

11  Temporary Restraining Order (With Notice) and Order to Show Cause

12  (the "Supplemental TRO").  (doc. 23).  Pursuant to the Supplemental

13  TRO, FINOVA was required to post a security bond in the amount of

14  $25,000.  Such bond was posted on September 12, 2002.

15      After a preliminary injunction hearing, the Court, in its

16  Preliminary Injunction dated September 27, 2002, continued the

17  Supplemental TRO, but increased the portion of the Collateral

18  Proceeds to be forwarded to FINOVA from 60% to 70%.  (doc. 40).

19  Pursuant to the Preliminary Injunction, FINOVA was required to post

20  a security bond in the amount of $100,000.  Such bond was posted on

21  October 1, 2002.

22      Thereafter, FINOVA proceeded with a public UCC sale of its

23  remaining Collateral, pursuant to Section 7.4 of the Loan

24  Agreement.  By written notice dated October 1, 2002, FINOVA

25  notified AMC and the Arledges that it intended to conduct a public

26  sale of the Collateral in accordance with the Loan Agreement and

27  the Uniform Commercial Code ("UCC").  FINOVA advertised the

28  scheduled UCC sale, and conducted the sale on October 28, 2002.

1  The Collateral was sold at the UCC sale pursuant to a credit bid of

2  $2,009,605.58, leaving a deficiency principal balance of

3  $1,665,193.30 owing under the Loan Agreement and Note, plus

4  interest accruing at the Stated Interest Rate.

5       **H. AMC's Search for New Financing and Claimed Damages**

6       After the loan with FINOVA ceased, AMC sought new financing

7  options.  To aid this process, Defendants hired a broker to help

8  the company establish a new loan agreement.  The brokerage contract

9  indicates that AMC was charged $25,000 as a retainer fee for the

10 broker's services, and then charged an additional 3% of the amount

11 of the secured loan as a "success" fee.  (Exbts. 238, 239).  On May

12 22, 2003, AMC signed a new financing contract with Oak Rock

13 Financial, LLC, for a revolving loan in the amount of $1,000,000

14 ("Oak Rock Financial Loan").  (Exbt. 237).  Thus, in total, AMC

15 paid $55,000 to the broker to locate the company's new financing

16 with Oak Rock Financial.  (Exbt. 239).  In addition, Oak Rock

17 Financial charged AMC an interest rate that was 4.75% higher than

18 that previously charged by FINOVA.  (Exbt. 296) at 6.

19      As a result of FINOVA's foreclosure of AMC's assets and

20 collateral, AMC alleges that it was forced out of business, lost

21 the equity in its receivables, lost future profits, incurred

22 wholesale and make-ready losses, lost its "tracers" (or

23 "trackers"), and lost the use of its sales tax credits.  Defendants

24 together claim that FINOVA's conduct forced them to hire a broker,

25 pay a fee to secure a new financing arrangement, and pay interest

26 in excess of the interest charged under the Loan Agreement.

27 Independently, the Arledges claim that FINOVA's conduct forced them

28 to sell their house for a loss of $250,000.

1  **II. CONCLUSIONS OF LAW**

2  1.   The Court has subject matter jurisdiction over this action

3  pursuant to 28 U.S.C. § 1332.

4  2.   The Court has personal jurisdiction over all of the parties,

5  and venue is proper in this district.

6       **A. Conclusions of Law with Respect to FINOVA's Complaint**

7  3.   The Loan Agreement is a valid and enforceable contract between

8  FINOVA and AMC.  The Guaranty creates a valid and enforceable

9  obligation owing by the Arledges, jointly and severally, in favor

10 of FINOVA.

11 4.   As found previously by the Court, the MNCFC under the Loan

12 Agreement is curable.

13 5.   FINOVA has the primary obligation to monitor the MNCFC.

14 However, the Court concludes that there is no reason why Defendants

15 could not also monitor the MNCFC, and, indeed, Defendants have

16 conducted such monitoring and have the greatest access to the

17 documents needed to determine the status of AMC's net cash flow.

18 6.   In any event, the nature of this breach by FINOVA was not so

19 fundamental to the contract to excuse Defendants from (1) granting

20 FINOVA access for a requested audit; (2) paying interest payments;

21 and (3) paying overadvance principal payments.

22 7.   One or more Events of Default arose under the Loan Agreement

23 as a result of AMC failing to pay FINOVA interest in accordance

24 with the Loan Agreement since June 2002, and AMC failing to repay

25 to FINOVA the various loan overadvances.

26    8.   One or more of these Events of Default arose under the

27 Loan Agreement as a result of AMC violating the MNCFC.

28 9.   Defendants are estopped from asserting that, under a

1 recalculation of AMC's cash flow, Arledge was not in violation of

2 the MNCFC in February and March of 2002.  Defendants are estopped

3 from making this assertion because they prevented FINOVA from

4 receiving and reviewing the information regarding the

5 recalculations.

6 10.   The Court is not satisfied that any of the exhibits received

7 at trial establish that Arledge sought in writing the amount of

8 money needed to cure the MNCFC violation.  One must greatly stretch

9 the language of Arledge's May 20, 2002 letter to DeWitte, stating

10 that AMC wanted to sell leases to "pay down the debt," to conclude

11 that AMC was requesting an amount to cure.

12 11.   The Court is not satisfied that Arledge was credible when he

13 testified that he called DeWitte daily requesting a cure amount,

14 however the Court finds that Arledge requested such an amount at

15 least once.

16 12.   The Court finds and concludes that, had FINOVA funded the

17 requested advance of $34,000 (requested on or about June 20, 2002),

18 it would not have altered in any material way Defendants' ability

19 to pay the overadvances.

20 13.   Thus, the Court concludes that FINOVA is entitled to the

21 unpaid amount of the debt, plus interest.  The amounts owing to

22 FINOVA are as follows:

23          (a) principal amount of $1,665,193.30;
             (b) pre-judgment interest through April 30, 2004
24          in the amount of $181,436.69;
             (c) pre-judgment interest from April 30, 2004
25          through March 31, 2006 (at $323.79 per day) in the
             amount of $226,653.00;
26          (d) pre-judgment interest after March 31, 2006
             through the date of this order (at $323.79 per
27          day); and
             (e) post-judgment interest as set by the clerk
28          pursuant to 28 U.S.C. § 1961.

1      **B. Conclusions of Law with Respect to Defendants' Counterclaim**

2  14.  FINOVA breached the Loan Agreement when (1) it did not allow

3  AMC the opportunity to cure and (2) when it failed to give AMC an

4  answer regarding its request to sell leases.

5  15.  Defendants Richard and Peggy Arledge lack standing to assert

6  any of the claims set forth in the Counterclaim.  Defendants have

7  provided no authority that indicates that, as guarantors, the

8  Arledges possess the necessary standing to affirmatively assert a

9  lender liability claim against FINOVA.  Pursuant to the Guaranty,

10  the Arledges are liable for the full amount of the deficiency owing

11  by AMC.  See Poling v. Morgan, 829 F.2d 882, 885 (9th Cir. 1987).

12  16.  The Court determines that there was no bad faith claim

13  asserted by Defendants, in the usual sense, and, in any event,

14  concludes that there is no basis for a bad faith claim.  Thus, Kurt

15  Bloeser's testimony is irrelevant, as there was no tort claim

16  asserted and, hence, there are no tort damages.  FINOVA's oral

17  motion to strike Bloeser's testimony shall be granted.

18  17.  Defendants have no right to any punitive damages, as such

19  damages are not an available remedy for a breach of contract claim.

20  See Rhue v. Dawson, 841 P.2d 215, 227 (Ariz. App. 1992).

21  18.  The Arledges, as guarantors, are not entitled to damages for

22  the sale of their house.

23  19.  The Court concludes that any damages due AMC shall only be

24  calculated to the end of the FINOVA loan period, September 30,

25  2004.

26  20.  AMC is entitled to the amount of damages incurred due to the

27  difference in the interest rates imposed under the FINOVA loan and

28  that imposed under the Oak Rock Financial Loan.  These damages,

- 18 -

1  however, shall only be calculated from the date Arledge obtained

2  the Oak Rock Financial Loan, May 22, 2003, (Exbt. 237), to

3  September 30, 2004.

4  21.   AMC is entitled to the cost of the finder's fee of $55,000.00,

5  incurred when it sought a new loan.

6  22.   AMC is entitled to the damages incurred due to lost tax

7  credits.   The Court accepts Don Erickson's, Defendants' expert,

8  calculation on this issue, equaling $301,260.00.   (Exbt. 296) at 5.

9  23.   AMC is entitled to a portion of the damages it claims with

10 regard to the "tracers."   Not all of the 222 "tracers" that AMC

11 lost retained the same value, because each likely had a different

12 age and history of use.   The Court concludes that AMC is entitled

13 to half of what it requests for the cost of the "tracer" devices,

14 valued at $350 each, and half the claimed costs for installing and

15 monitoring the "tracers" for a total of $58,275.00.

16 24.   Lastly, but for the damages listed above, the Court finds that

17 there has been an insufficient showing that AMC suffered any lost

18 profits.   Thus, AMC is not entitled to any damages for other

19 alleged lost profits.

20      IT IS ORDERED that plaintiff shall lodge a proposed form of

21 judgment, consistent with this order, within ten (10) days of the

22 entry of the order.   The defendants, at their option, may lodge a

23 proposed form of judgment within the same 10 days.   The Court

24 . . .

25

26

27

28

- 19 -

1   encourages the parties to seek to agree as to the proposed form of

2   judgment.

3           DATED this 31st day of August, 2006.

4

5

6           _____
            Robert C. Broomfield

7           Senior United States District Judge

8

9

10  Copies to counsel of record.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28