WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

FINOVA Capital Corporation,        )
a Delaware corporation             )
                                   )
  Plaintiff/Counter-defendant      )
                                   )      No. CIV 02-1277-PHX-RCB
          vs.                      )
                                   )         O R D E R
                                   )
Richard A. Arledge, Inc. a         )
Texas corporation d/b/a            )
Arledge Motor Co., Richard A.      )
Arledge, individually and as       )
the husband of Peggy L.            )
Arledge, and Peggy L.              )
Arledge, individually and as       )
the wife of Richard A.             )
Arledge,                           )
                                   )
     Defendants/Counter-           )
     Plaintiff/Third-Party         )
     Plaintiff,                    )
                                   )
          vs.                      )
                                   )
Leucadia National                  )
Corporation,                       )
                                   )
     Third-Party Defendant.        )
_____)

### *Background*

        Essentially the present action is a contract dispute arising

out of a Loan Agreement between plaintiff FINOVA Capital Corporation ("FINOVA"), as the lender, and defendants Richard A. Arledge, Inc. d/b/a Arledge Motor Co. ("AMC"), *et al.*, as the borrowers.  Following a six day bench trial, the court issued its findings of fact and conclusions of law as Fed. R. Civ. P. 52(a) requires.  In <u>FINOVA Capital Corporation v. Arledge</u>, 2006 WL 2547350 (D. Ariz. Aug. 31, 2006) (doc. 266) ("<u>FINOVA II</u>"), the court found that defendants were liable to FINOVA because although FINOVA breached the Loan Agreement, the "nature of th[at] breach . . . was not so fundamental" so as "to excuse defendants" from certain obligations thereunder.  <u>Id.</u> at *9, ¶ 6.  Thus, the court awarded FINOVA damages in "the principal amount of $1,665,193.30," plus pre-judgment interest and post-judgment interest thereon.  <u>Id.</u> at *9, ¶ 13(a).  By the same token though, the court also found that FINOVA breached the Loan Agreement.  <u>Id.</u> at *9, ¶ 14.  Hence, the court awarded AMC damages in "the principal amount of $479,213.08," plus pre-judgment and post-judgment interest thereon. Doc. 269 at 2, ¶ 2.[1]

Currently pending before the court are two post-judgment motions: (1) "Plaintiff's Motion to Alter or Amend Judgment and to Amend Findings and Conclusions" (doc. 278); and (2) "Defendants' Motions for New Trial, to Amend Findings of Fact and Conclusions of Law and to Amend Judgment and Supporting Memorandum of Points and Authorities"[2] (doc. 280).  In addition, also pending before the

---

[1]      As a result of AMC's recovery against FINOVA, the judgment provides for a set-off.  <u>See</u> Doc. 269 at 2, ¶ 3.

[2]      Although, as just stated, defendants style this motion as one for a new trial (among other things), a  close reading of their motion shows that they are not actually seeking a new trial.  Rather, defendants are seeking to have this

1  court is "Plaintiff's Motion for Order (A) Exonerating Parties

2  Under Bonds and (B) Vacating Provisional Attachment Order" (doc.

3  268).  Having found oral argument unnecessary, the court rules as

4  follows.

5  ***Discussion***

6  ***I.  Post-Judgment Motions***

7     ***A.  Governing Legal Standards***

8       ***1.  Fed. R. Civ. P. 52***

9     The parties timely moved for relief under Fed. R. Civ. P. 52.

10  Rule 52(b) provides in relevant part that "[o]n a party's motion

11  filed not later than 10 days after entry or judgment, the court may

12  amend its findings – or make additional findings – and may amend

13  the judgment accordingly."  "Recognized grounds for Rule 52 motions

14  include: (1) the trial court made a manifest mistake of fact or

15  law, (2) there is newly discovered evidence, and (3) there has been

16  a change in the law." Cohn v. Contra Costa Health Services

17  Department, 2006 WL 825276, at *1 (N.D. Cal. March 29, 2006)

18  (internal quotation marks and citation omitted).  However, "[a]

19  party may not use Rule 52 to relitigate issues or advance new legal

20  theories, and a court should not rehear the merits of the case."

21  Id. (internal quotation marks and citation omitted).  Likewise,

22  "Rule 52 is not a substitute for appeal, nor is it an equitable

23  response to the request for just one more time, please." Id. at *2

24  ────────────────────

25  court "vacate" FINOVA II and the judgment entered in accordance therewith.  Mot.
    (doc. 280) at 4.  Defendants are further seeking to have this court "reopen the

26  case and enter [their pre-trial] proposed findings of fact and conclusions of law
    [,]" and then enter "a judgment consistent therewith."  Id.  Alternatively,
    defendants are seeking to have this court "at a minimum, . . . amend the findings

27  of fact and conclusions of law" in FINOVA II, and likewise to amend the judgment
    as to four separate issues which will be discussed herein.  See id. The court will

28  tailor its discussion of defendants' motion accordingly, omitting any consideration
    of a new trial.

1   (internal quotation marks end citation omitted).

2           **_2.  Fed. R. Civ. P. 59_**

3           The standard for altering or amending a judgment under Rule

4   59(e) is nearly identical to the standard for granting similar

5   relief under Rule 52.  According to the Ninth Circuit, "[a]mendment

6   or alternation is appropriate under Rule 59(e) if (1) the district

7   court is presented with newly discovered evidence, (2) the district

8   court committed clear error or made an initial decision that was

9   manifestly unjust, or (3) there is an intervening change in

10  controlling law." Zimmerman v. City of Oakland, 255 F.3d 734, 740

11  (9th Cir. 2001) (citation omitted).  Rule 59(e) is an

12  "extraordinary remedy, to be used sparingly in the interests of

13  finality and conservation of judicial resources." Kona

14  Enterprises, Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir.

15  2000).  Thus, "absent highly unusual circumstances[]" a judgment is

16  not properly reopened. Id.; see also Cohn, 2006 WL 825276, at *1

17  (internal quotation marks and citation omitted) ("[A] judgment [in

18  a nonjury case] should not be set aside except for substantial

19  reasons.")

20          Denial of a motion to amend a judgment is subject to an abuse

21  of discretion standard of appellate review. See Gibson v. Galaza,

22  2007 WL 868011, at *1 (E.D. Cal. March 20, 2007) (citing Far Out

23  Productions, Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001)).

24  Generally, "[a] district court abuses its discretion when it bases

25  its decision on an erroneous view of the law or a clearly erroneous

26  assessment of the facts." Id. (citing Coughlin v. Tailhook Ass'n,

27  112 F.33 1052, 1055 (9th Cir. 1997)).  With these general

28  principles firmly in mind, the court has carefully considered the

                                    - 4 -

1   parties' respective motions to alter and/or amend the judgment.

2       **B.  FINOVA's Post-Judgment Motion**

3           **1.  Opportunity to Cure**

4       Earlier in this litigation, among other things, the court

5   rejected "Finova's contention that a violation of the [Loan

6   Agreement's] MNCF [minimum net cash flow] covenant is incurable."

7   Doc. 167 ("FINOVA I") at 25.  The court thus partially granted

8   defendants' summary judgment motion finding that "while there [wa]s

9   a qualifier as to the cure allowed ("Lender's satisfaction"),"

10  under the terms of the subject Loan Agreement, "there [wa]s

11  unquestionably a right to cure[]" the MNCF covenant.  Id. at 24.

12  Further, in FINOVA I the court found that "a meaningful 'cure' must

13  necessarily permit the [defendants] to inject enough money into the

14  company to achieve a positive net cash flow, as defined in . . .

15  the Loan Agreement[.]" Id. at 27. The court opined that "[n]o other

16  interpretation of th[e] [MCNF] covenant would be reasonable under

17  the contract as a whole."[3]  Id.

18      Given these rulings, plainly one of the issues at trial was

19  whether FINOVA gave defendants an opportunity to exercise their

20  right under the Loan Agreement to cure the minimum net cash flow

21  covenant ("MNCFC").  After carefully considering all of the trial

22  proof, in FINOVA II this court expressly found that FINOVA "did not

23  allow AMC the opportunity to cure[;]" hence FINOVA breached the

24  Loan Agreement.  See FINOVA II, 2006 WL 2547340, at *9.  As FINOVA

25  views the trial proof, however, there was no evidence to support

26

27          [3]     FINOVA "accept[s]" these rulings "[f]or purposes of this motion," but
28  is expressly reserving its rights to challenge these rulings on appeal. See Mot.
    (doc. 278) at 4, n.2.

1   that conclusion.  Thus, "as a matter of law[]" FINOVA asserts that

2   that finding cannot be a basis for holding that it breached the

3   Loan Agreement.  See Mot. (doc. 278) at 6.

4        FINOVA correctly frames the issue on this motion as "whether

5   there is any evidence to support the Court's conclusion that FINOVA

6   'did not allow AMC the opportunity to cure' its cash flow

7   shortfall."  Id. at 5.  FINOVA goes on, however, to couch its

8   argument in slightly different terms.  More specifically, FINOVA

9   contends that "there [wa]s no evidence that [it] *prevented*

10  defendant Richard Arledge from infusing cash into his own company

11  in an attempt to cure any cash shortfall."  Id. (emphasis in

12  original).

13       To support this contention, FINOVA relies upon a snippet of

14  trial testimony from Ryan De Witte, the FINOVA Account Executive

15  responsible for AMC's account.  Mr. De Witte agreed that after he

16  noticed that AMC was in default under the Loan Agreement on May 7,

17  2002, he "sent an e-mail with a spreadsheet containing FINOVA's

18  calculation of the [MNCFC] on May 16th, May 17th[.]" Id. (citation

19  omitted).  Following up on that question, Mr. DeWitte was asked

20  "with that information, did Mr. Arledge ever put money into [AMC]

21  to make up for that difference?"  Id. (citation omitted).  Mr. De

22  Witte simply responded, "No."  Id. (citation omitted).  From

23  FINOVA's perspective, this testimony shows that the prevention

24  "issue never even arose[]" during the trial.  Id.

25       Defendants retort that by framing it in terms of prevention,

26  FINOVA is "mischaracteri[zing]" the issue.  Resp. (doc. 285) at 2.

27  Furthermore, FINOVA's prevention argument, according to defendants,

28  "ignores the fact that [defendant] Arledge repeatedly disputed the

1  MNCFC calculation on which the alleged default was based[.]" _Id._

2  (citations and footnote omitted).  As defendants summarize it, the

3  court should deny FINOVA's motion on the cure issue because "with a

4  dispute as to the accuracy of the MNCFC calculation, and, more

5  importantly, without any information as to the amount FINOVA would

6  require and in the face of a claim that the default could not be

7  cured, Arledge can hardly be faulted for not infusing an uncertain

8  and unknown amount of cash to cure an 'incurable' default."  _Id._ at

9  3 (citations omitted).

10      At the outset, the court observes that preventing the Loan

11  Agreement from being cured or "not allow[ing] AMC the opportunity

12  to cure[,]" are two sides of the same coin.  _See_ _FINOVA II_, 2006 WL

13  2547340, at *9.  It is possible, for example, to view FINOVA's

14  failure to provide defendants with an amount of the claimed MNCFC

15  violation as an act by FINOVA which effectively prevented

16  defendants from curing that violation.  At the same time, it is

17  also possible to view that same inaction by FINOVA, as did the

18  court, as "not allow[ing] AMC the opportunity to cure[.]" _See_ _id._

19  Thus, as can be seen, reframing the cure issue does nothing to

20  advance FINOVA's argument that the evidence does not support the

21  court's finding that FINOVA did not allow AMC the opportunity to

22  cure.

23      What is more, there is ample record proof, which FINOVA

24  conveniently overlooks, to support this court's determination that

25  FINOVA "did not allow AMC the opportunity to cure" the MNCFC

26  violation.  _See_ _id._  For instance, by selectively quoting from Mr.

27  De Witte's trial testimony, FINOVA fails to take into account that

28  he repeatedly testified that the MNCFC violation could not be

1    cured.  Mr. De Witte took that position during a conversation he

2    had with defendant Arledge shortly after Arledge received the May

3    7th Default Notice from FINOVA.  <u>See</u> Tr. (4/11/06) (doc. 273) at

4    151-52.  Mr. De Witte's testimony in that regard was unequivocal.

5    When asked, "Do you remember making it clear to Mr. Arledge that a

6    violation of the [MNCFC] in his loan agreement could not be

7    cured[,]" Mr. De Witte responded, "I do recall that, absolutely."

8    <u>Id.</u> at 153.  Mr. De Witte freely admitted that following the May

9    7th Default Notice he had "numerous conversations" with defendant

10   Arledge during which he told Arledge "that it [the MNCFC] was a

11   non-curable default."  <u>Id.</u> at 184.  Plainly the foregoing supports

12   this court's factual finding in <u>FINOVA II</u> that during the ten day

13   cure period "De Witte *continued* to tell Arledge that the violation

14   was not curable."  <u>FINOVA II</u>, 2006 WL 2547340, at *5 (emphasis

15   added).

16       In a similar vein, Mr. De Witte agreed that "there was nothing

17   that [Mr.] Arledge could have done to cure a breach of that

18   covenant [MNCF][.]" Doc. 273 at 153:12-14.  Mr. De Witte explained

19   that that was his "viewpoint[,] . . . based on conversations with

20   [FINOVA's] in-house counsel."  <u>Id.</u> at 153:17-18.  FINOVA, through

21   Mr. De Witte, held steadfastly to its conviction that the default

22   was incurable "[e]ven in the first part of June," 2002.  <u>Id.</u> at

23   166:8.  This view was echoed in a June 11, 2002, letter from

24   FINOVA's Vice President and Assistant General Counsel wherein he

25   states:

26              FINOVA maintains that events of default
               exist under the loan agreement.  Moreover,
27              as you are probably aware, breaching a
               financial covenant is not susceptible to
28              being cured because it is based on financial

1          performance measurement for a specific period
           of time.  In other words, borrower cannot undo
2          its financial performance that results in a
           covenant violation.

3

4    Id. at 190 (quoting exh. 127 at 2).

5          Consistent with its position that the MNCFC was not curable,

6    when asked if "Finova ever provide[d] [him] *any means* by which [he]

7    could cure the [MNCFC][,]" defendant Arledge simply responded,

8    "No."  Tr. (4/14/06) (doc. 274) at 165.  Indeed Arledge testified

9    that he "was told specifically that putting money in would not cure

10   the [MNCFC]."  Id. at 164.  Not only is the record replete with

11   references to the fact that FINOVA viewed the default as incurable,

12   it also contains testimony from Mr. DeWitte conceding that prior to

13   this litigation FINOVA never sent defendants "[c]orrect

14   calculations" as to the amount necessary to cure the default.  See

15   Doc. 273 at 188-89.  This failure to provide defendants with the

16   accurate calculations necessary to cure the default was compounded

17   by FINOVA's insistence that the default was not curable in the

18   first instance.

19         As the foregoing shows, there are ample record facts to

20   support the court's conclusion of law that "**FINOVA** breached the

21   Loan Agreement when . . . it did not allow AMC the opportunity to

22   cure[.]"  FINOVA II, 2006 WL 2547340, at *9, ¶ 14.  Moreover, even

23   if framed, as FINOVA does, in terms of FINOVA preventing defendants

24   from curing the breach, the same evidence can easily support that

25   conclusion as well.  In short, although the court may have

26   "[d]rawn[n] different inferences from the evidence and testimony at

27   trial than [FINOVA] would have preferred" as to whether FINOVA

28   allowed defendants the opportunity to cure, that "does not rise to

1   the level of a manifest error of fact."  See Cohn, 2006 WL 825276,

2   at *2.  Nor has FINOVA shown that the court "made a manifest

3   mistake of . . . law" in finding that FINOVA did not give

4   defendants an opportunity to cure the breach.  See id. at *1

5   (internal quotation marks and citation omitted).  In fact, FINOVA

6   has not pointed to any law to support such a view.

7        As can be seen, in essence FINOVA is attempting to relitigate

8   the cure issue.  As set forth at the outset, however, neither Rule

9   52 or Rule 59 provides a basis for the court to reconsider the

10  merits.  Accordingly, the court denies FINOVA's motion to alter

11  and/or amend to the extent that motion is premised upon the court's

12  finding that FINOVA did not allow defendants the opportunity to

13  cure the default.

14          ***2.  Sale of Leases***

15       In FINOVA II the court made several factual findings with

16  respect to a May 20, 2002, letter from defendant Arledge to Mr. De

17  Witte.  In that letter, defendant Arledge wrote, among other

18  things:

19              I AM REQUESTING **FINOVA** TO *ALLOW ME TO SELL*
                *SOME OR ALL OF MY LEASES*.  THE MONIES
20              GENERATED BY THIS SALE WILL ENABLE ME TO PAY
                DOWN THE DEBT TO **FINOVA** AND GENERATE CASH, WHICH
21              WILL ALLOW ME TO PURCHASE A NEW CAR FRANCHISE.

22  FINOVA II, 2006 WL 2547340, at *6 (quoting exh. 125) (emphasis

23  added). The court flatly rejected Arledge's contention "that this

24  letter was a written request for the exact amount that was needed

25  to cure the Default."  Id.  Although it disagreed with Arledge as

26  to the meaning of this letter, the court did find found that

27  "**FINOVA** never responded to Arledge's request."  Id.  Based upon the

28  foregoing, the court held that "**FINOVA** breached the Loan Agreement

1  . . . when it failed to give AMC an answer regarding its request to
2  sell leases." <u>Id.</u> at *9.

3      Now FINOVA is seeking to have the court amend <u>FINOVA II</u> to
4  delete this particular conclusion of law.  As with the cure issue,
5  FINOVA claims that there is no evidence in the record to support
6  the conclusion that it did not respond to defendant Arledge's
7  request to sell leases.  In its Reply, FINOVA further claims that
8  the court "overlooked" the following testimony by Mr. De Witte.
9  When asked whether he "recall[ed] what [he] told [Mr. Arledge]
10 Finova's position was as to selling . . . leases[,]" DeWitte
11 replied: "I told [Arledge] that to the extent that he was able to
12 go out and find a buyer to buy his assets, that he certainly could
13 do so as long as the proceeds were used to pay off Finova's debt."
14 Doc. 273 at 67.  From FINOVA's perspective, this testimony
15 undermines the court's legal conclusion that FINOVA breached the
16 Loan Agreement by "fail[ing] to give AMC an answer regarding its
17 request to sell leases."  <u>FINOVA II</u>, 2006 WL 2547340, at *9.

18     Despite FINOVA's protestations to the contrary, the court did
19 not "overlook" the quoted excerpt from Mr. De Witte's trial
20 testimony, which is FINOVA's sole basis for challenging the court's
21 finding that it did not respond to defendant Arledge's request to
22 sell leases.  Instead, as was its prerogative, the court choose to
23 credit the overwhelming countervailing testimony.  For example, Mr.
24 Arledge testified that repeatedly FINOVA did not respond to his
25 requests, verbal or written, to sell leases.  <u>See</u> Doc. 274 at
26 124:16-24; 154:3-6; and 154: 13-25.  In fact, when pointedly asked,
27 "did Mr. DeWitte or anybody at Finova ever discuss with you your
28 requ[ests] to sell leases[,]" Mr. Arledge replied, "No."  <u>Id.</u> at

154:25 - 155:1-2.  Mr. Arledge answered in much the same way when asked whether "Finova ever respond[ed] to [his] request to sell leases[,]" emphatically stating, "Finova has *never responded* to my request to sell leases  <u>Id.</u> at 156:11 (emphasis added).

In light of the foregoing, and taking the record as whole, there was no "manifest mistake of fact or law[]" warranting altering or amending the judgment with respect to the court's finding that FINOVA did not respond to Arledge's request to sell leases.  As it did with the cure issue, FINOVA is seeking to have the court rehear the merits of this case, which is an improper basis for invoking Rule 52 or, for that matter, Rule 59.  Thus, the court denies FINOVA's motion to alter or amend the judgment and to amend the court's findings of fact and conclusions of law as set forth in <u>FINOVA II</u> as it relates to the court's finding that FINOVA did not respond to defendant Arledge's request to sell leases.

### *3.  Lost Sales Tax Credits*

In <u>FINOVA II</u>, this court found that "AMC is entitled to the damages incurred due to lost tax credits[.]"  <u>FINOVA II</u>, 2006 WL 2547340, at *10, ¶ 22.  In awarding such damages, the court expressly  "accept[ed] Don Erickson's, Defendants' expert, calculation on th[at] issue, equaling $301,260.00[,]" and cited to page 5 of  exhibit 296, Mr. Erickson's entire report, as the basis for that finding.  <u>See id.</u> (citation omitted).

In the event the court, as it has, upholds its findings of liability against FINOVA as to defendants' counterclaim, FINOVA is making an alternative "narrow request[.]"  Mot. (doc. 278) at 9. It is seeking to amend the judgment to reduce the "principal amount of the damage award against" FINOVA from $479.213.08 to

1   $363,177.94.  Id. at 10, ¶ E(ii).  Consistent with that request,

2   FINOVA also is seeking to amend paragraph 22 of section B of FINOVA

3   II, entitled "Conclusions of Law with Respect to Defendants'

4   Counterclaim[,]" to replace the number "301,260.00" with

5   "$185,224.86[.]" Reply (doc. 286) at 9, ¶ 2(a).  This reduction

6   represents the difference between the lost tax credit damages

7   ($301,260.00) as indicated in Mr. Erickson's expert report which

8   was not admitted into evidence (exh. 296 at 5), and the amount of

9   such credits to which he actually testified ($185,224.86).  See Tr.

10  (4/17/06) (doc. 275) at 112:18-22.  FINOVA also seeks to amend the

11  order, as reflected in FINOVA II, to delete the reference to

12  exhibit 296 because, as just noted, that exhibit was not offered or

13  received into evidence.  See Reply (doc. 286) at 9, ¶ 2(b).

14      Plainly FINOVA's position is well taken; and, indeed,

15  defendants explicitly "concede" that this reduction is proper

16  "based on the evidence presented at trial."  Resp. (doc. 285) at 2,

17  n.1.  Accordingly, the court grants FINOVA's motion to alter or

18  amend the judgment, and likewise to amend the FINOVA II order to

19  omit the reference to exhibit 296, as just discussed.  In all other

20  respects, however, for the reasons set forth above, the court

21  denies FINOVA's motion to alter and/or amend FINOVA II and the

22  corresponding judgment.

23      ***C.  Defendants' Post-Judgment Motion***

24      Defendants contend that this court in FINOVA II (and in the

25  corresponding judgment) committed "manifest errors of both law and

26  fact" with respect to four different issues, each of which will be

27  discussed below.  See Mot. (doc. 280) at 4.  From defendants'

28  standpoint because those four issues "go [to] the heart of this

1   case[,]" the court should "completely vacat[e] [FINOVA II] and the

2   Judgment and entering the proposed Findings of Fact and Conclusions

3   of Law lodged by Defendants prior to trial." Id. at 17.  If the

4   court disagrees, "at a minimum[]" the defendants "urge" the court

5   to delete nine specific parts of FINOVA II, and to add three new

6   findings of fact and six new conclusions of law.  See id. at 17-18.

7           *1.  MNCFC Violation*

8        According to defendants, under section 1.40 of the Loan

9   Agreement, "[t]o calculate AMC's Net Cash Flow and prove a

10  violation of the [MNCFC], FINOVA had to include in its

11  calculations[,]" among other things, "'all [of AMC's] cash

12  receipts, including, but not limited to, collections on Receivables

13  and Lease[s], down payment, trade-ins on sales and repossession

14  recoveries.'" Id. at 5 (quoting FINOVA II, 2006 WL 2547340, at *2

15  (quoting in turn exh. 108)).  Defendants maintain, however, that

16  FINOVA did not fully comply with that requirement because "in

17  determining AMC violated the MNCFC and in issuing its May 7, 2002,

18  default letter, FINOVA admitted 'all cash receipts' of AMC were not

19  included in its calculations, nor did it offer at trial

20  calculations purporting to include the omitted cash receipts." Id.

21       Defendants further argue, albeit implicitly, that FINOVA erred

22  in calculating AMC's net cash flow because it did not include

23  defendant Arledge's contributions to AMC.  See id. at 6.  Based

24  upon the foregoing, defendants maintain that "FINOVA did not

25  satisfy its burden" of proving that "AMC violated the MNCFC." Id.

26  In other words, defendants argue that FINOVA did not prove an MNCFC

27  violation at trial because FINOVA improperly calculated their net

28  cash flow.

1   This defense argument is not new to the court.  At various

2   times throughout this litigation, including during the trial,

3   defendants made this same argument.[4]  Thus the court finds that, as

4   did FINOVA, defendants are improperly Rules 52 and 59 to relitigate

5   previously resolved issues, *e.g.*, the issue of how FINOVA

6   calculated the MNCFC violation.  In essence, defendants are asking

7   this court to "rehear the merits of the case," which is precisely

8   what a court should *not* do on a Rule 52 motion such as this.  See

9   Cohn, 2006 WL 825276, at *1.

10  What is more, even if the court were to revisit the issue of

11  how FINOVA calculated the MNCFC violation, it would reach the same

12  conclusion: FINOVA proved that defendants breached that covenant.

13  Among other ways, FINOVA proved that breach through the testimony

14  of Mr. De Witte.  He explained that in accordance with the express

15  terms of the Loan Agreement, to calculate defendants' net cash flow

16  FINOVA examined the financial statements provided by defendants.[5]

17  See Resp. (doc. 284) at 5 (citing doc. 273 at 60:25-61:1-9).  When

18  it did that, FINOVA found a violation of the MNCFC.  See id.

19  (citing, *inter alia*, doc. 273 at 51:9-25-52:1-15).  Thus, to the

---

21  [4]      In fact, in the Final Pretrial Order, to which the parties stipulated,
22  among the "contested issues of fact and law[]" defendants identified were the
    following:

23          Whether FINOVA included AMC's security
            deposits, repossession fees, returned
            check charges and late fees in calculating
24          the [MNCFC][;] [and] . . . Whether FINOVA
            included the cash the Arledges deposited into
25          AMC in calculating the [MNCFC].

26  Doc. 231 at 17, ¶¶ 4 and 5.

27  [5]      Section 1.40 of the Loan Agreement defined "Net Cash Flow" as "the sum"
    of "all cash receipts" and "all cash expenses" which were "reflected on the
28  financial statements of Borrower [Arledge d/b/a AMC] to Lender [FINOVA][.]" Def.
    Tr. exh. 108 at 4, § 1.40.

1   extent defendants are suggesting in this motion that FINOVA did not

2   prove a breach of the MNCFC because it did not look beyond the

3   financial documents provided by defendants, plainly that argument

4   is without merit.   The Loan Agreement did not place such an

5   obligation upon FINOVA.   FINOVA was entitled, as it did, and as

6   defendants were aware that it would, to rely upon the financial

7   statements defendants supplied to calculate the net cash flow.   See

8   Doc. 274 at 13:7-16.   Succinctly put, defendants have not satisfied

9   the court that it made a "manifest mistake of law or fact" when it

10  found that AMC violated the MNCFC.   Thus, the court denies

11  defendants' motion to alter and/or amend the judgment in this

12  regard.

13              ***2. Estoppel***

14       As to FINOVA's complaint, the court specifically found that

15  "[b]etween May 7, 2002 and May 17, 2002, [defendant] Arledge called

16  [FINOVA] numerous times to discuss the MNCFC violation." FINOVA

17  II, 2006 WL 2547340 at *5.   Even though "[d]uring those

18  conversations, Arledge asserted that, according to his own

19  calculation, AMC was not in default[,]" the court found that "AMC

20  refused to provide such exonerating calculations to [FINOVA] for

21  comparison." Id.   Perhaps more significant in terms of the present

22  motion is the court's additional finding that "[t]hroughout the

23  litigation of this lawsuit, Arledge and AMC continued to refuse to

24  provide such calculations based on attorney client privilege and

25  the work product doctrine." Id.

26       Indeed, it was not until May 6, 2005, that defendants

27  ultimately provided FINOVA with the purportedly exonerating

28  calculations.   See id. at *6.   In light of these findings of fact,

the court expressly held that "[d]efendants [we]re estopped from

asserting that, under a recalculation of AMC's cash flow, Arledge

was not in violation of the MNCFC in February and March of 2002."

See Id. at *9, ¶9.  The court reached this conclusion because

defendants "prevented **FINOVA** from receiving and reviewing the

information regarding the recalculations."   Id.

As an additional basis for vacating the judgment, defendants

challenge this "estoppel" ruling.  They do so on two grounds.

First, defendants note that FINOVA did not specifically "identify

estoppel in the [pre-trial order] as a means to avoid AMC's

assertion [that] FINOVA did not properly calculate or prove the

default under the MNCFC."  Mot. (doc. 280) at 7 (footnote omitted).

This argument is without merit.  Even a cursory reading of FINOVA II

shows that the issue was not whether FINOVA established estoppel as

an affirmative defense.  Rather, the issue was whether defendants

should be precluded from relying upon Arledge's recalculations due

to defendants' failure to timely disclose that evidence.  Clearly

those are separate and distinct issues.  Thus, even assuming

*arguendo* that FINOVA did not assert estoppel as an affirmative

defense in the pre-trial order, such an omission is not fatal to

the court's "estoppel" ruling because that ruling was not

predicated upon FINOVA's proving estoppel as an affirmative

defense.

Second, assuming (incorrectly) that the court in FINOVA II was

applying the doctrine of equitable estoppel, defendants assert that

the court erred because FINOVA did not prove "even one of the three

elements necessary" to establish equitable estoppel.  See id. at 8.

Defendants further claim that because equitable estoppel is an

1    affirmative defense, by invoking it to "preclude [defendants']

2    direct rebuttal of evidence offered by FINOVA that a violation of

3    the MNCFC occurred[,]" the court "effectively turn[ed] on its head

4    FINOVA's burden to prove a breach of the MNCFC."  Id.

5        FINOVA accurately responds that defendants' second argument

6    "miss[es] the point of the Court's estoppel ruling[.]" Resp. (doc.

7    284) at 7.  To be sure, the court did state that defendants were

8    "estopped from asserting that . . . Arledge was not in violation of

9    the MNCFC[.]"  FINOVA II, 2006 WL 2547340, at *9, ¶ 9.  Despite the

10   court's use of the word "estop[,]" it is readily apparent from

11   FINOVA II and the prior proceedings as detailed in the record, that

12   the court did not actually rely upon estoppel as a legal term of

13   art or doctrine as, for example, equitable or judicial estoppel.

14   Rather, as even a cursory reading of FINOVA II shows, what the

15   court actually did was to preclude defendants from relying upon

16   Arledge's recalculation of AMC's cash flow.  The primary reason for

17   preclusion was defendants' failure to timely disclose, and the

18   resultant prejudice to FINOVA.  Accordingly, defendants' equitable

19   estoppel analysis is not relevant to the court's decision to

20   preclude defendants' recalculation evidence.

21       Moreover, given defendants' history of not providing the

22   supposedly exonerating calculations, the court was within its

23   discretion in precluding the admission of such evidence under Fed.

24   R. Civ. P. 37(c)(1) – a fact which defendants overlook.  Under that

25   Rule, when a party, "without substantial justification fails to

26

27

28

1  disclose" certain information,[6] that party is "not, unless such

2  failure is harmless, permitted to use as evidence at a trial. . .

3  any . . . information not so disclosed."  Fed. R. Civ. P. 37(c)(1).

4  Defendants, as the party facing preclusion, had the burden of

5  proving harmlessness.  <u>See</u> <u>Yeti by Molly v. Deckers Outdoor Corp.</u>,

6  259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is

7  that the burden is on the party facing sanctions to prove

8  harmlessness.")

9      In <u>FINOVA II</u> the court did not explicitly find that defendants

10 were "without substantial justification" when they did not timely

11 disclose Arledge's recalculations.  The circumstances surrounding

12 defendants' failure to disclose that evidence, which are well

13 documented in the record,[7] readily support such a finding however.

14 In <u>FINOVA I</u> this court held that "while Finova may have originally

15 erred to some degree in its original calculation of AMC's default

16 of the MNCF covenant – AMC was in fact (to <u>*some*</u> degree) in

17 violation of that covenant."  <u>FINOVA I</u> (doc. 167) at 14 (emphasis

18 in original).  Not only that, in <u>FINOVA I</u> the court expressly noted

19 that it had "little trouble concluding that some violation of the

20 MNCF covenant occurred (*based on Defendants' failure to dispute*

21 *this specific point*)[.]" <u>Id.</u> at 14-15 (emphasis added).  The

22 litigation proceeded with FINOVA relying upon those rulings.

23 _____

24      [6]    The type of "information" to which Rule 37(c)(1) applies includes "a
copy of, or a description by category and location of, all documents, data

25 compilations, and tangible things that are in the possession, custody, or control
of the party and that the *disclosing party may use to support its claims or*

26 *defenses*[.]"  Fed. R. Civ. P. 26(a)(1)(B) (emphasis added).  Plainly Arledge's
recalculations supported defendants' position that the MNCFC was not breached, and

27 thus such evidence falls into the category of documents which defendants had a duty
to disclose under Rule 26.

28      [7]    <u>See</u>, <u>e.g.</u>, Resp. (doc. 284) at 7-10 (and citations therein).

1      Within days after the issuance of <u>FINOVA I</u>, however, defendant

2  Arledge "realized" that FINOVA's calculations, which formed the

3  basis for finding that "AMC had violated the MNCFC did not include"

4  certain items.  <u>FINOVA II</u>, 2006 WL 2547340, at *6 (citation

5  omitted).  Therefore, Arledge recalculated AMC's net cash flow and

6  "[i]n April 2005, [he] conducted a final calculation of the MNCFC

7  for the contested time period."  <u>Id.</u>  As noted earlier, that

8  "calculation was ultimately provided to **FINOVA** on May 6, 2005[,]"

9  after the close of discovery.  <u>Id.</u>  The timing of Arledge's

10 recalculations (coming on the heels of an adverse summary judgment

11 ruling), coupled with their late disclosure, provides sufficient

12 justification for preclusion under Rule 37(c)(1).

13      What is more, finding that defendants were "without

14 substantial justification" for failing to timely disclose is

15 implicit in the court's stated  "belie[f]" that there was "harm to

16 plaintiff [FINOVA] in [defendants'] failure to disclose [that

17 evidence] earlier."  Doc. 275 at 92:10.  The record easily supports

18 this finding of harm given, as just explained, the timing of

19 defendants' disclosure of the cash flow recalculations.  Thus,

20 because defendants were "without substantial justification" for

21 their late disclosure of Arledge's recalculations, and because

22 defendants did not satisfy their burden of showing that such

23 disclosure was harmless, preclusion under Rule 37(c)(1) was

24 warranted.  Accordingly, to the extent defendants are seeking to

25 amend the judgment based upon that preclusion ruling, the court

26 denies this aspect of defendants' motion.

27          ***3.  Material Breach***

28      Third, defendants disagree with the court's conclusion of law

that "the nature of [FINOVA's] breach . . . was not so fundamental
to the contract to excuse [them] from (1) granting FINOVA access
for a requested audit; (2) paying interest payments; and (3) paying
overadvance principal payments." Mot. (doc. 280) at *9, ¶ 6.  They
also challenge the court's related finding that "had **FINOVA** funded
the requested advance of $34,000 (requested on or about June 20,
2002), it would not have altered in any material way Defendants'
ability to pay the overadvances."  FINOVA II, 2006 WL 2547340, at
*9, ¶ 12.

    Once again, defendants are taking the position that "FINOVA's
breaches, including . . . its refusal to allow AMC to sell leases
to pay off the loan and to make the advance requested on June 20,
2002 were material and excused AMC's further performance."  Mot.
(doc. 280) at 10.  Defendants then analyze each of the five factors
under section 241 of the Restatement of Contracts (Second), which
they claim should be taken into account when deciding whether a
given breach is material.  Defendants assert that they are entitled
to relief under Rule 52 and/or Rule 59 because the "the Court
failed to properly apply" those Restatement factors.  Id. at 11.

    FINOVA responds analyzing the same five Restatement factors,
and reaches the opposite conclusion: The court properly found that
FINOVA's breach was not material so as to excuse defendants from
performing certain obligations under the Loan Agreement.

    This materiality argument need not detain the court for long.
This is an argument which defendants have consistently made
throughout this litigation.  In fact, in the Final Pre-Trial Order
(to which the parties stipulated), not only did defendants argue,
as they are on this motion, a material breach by FINOVA, but they

1   also outlined the five Restatement factors.  <u>See</u> Doc. 231 at 11-13.

2   Defendants' argument is nothing more than a transparent attempt to

3   relitigate the material breach issue.  However, as noted earlier,

4   the purpose of a Rule 52 motion is not to rehear the merits of the

5   case.  <u>See</u> <u>Cohn</u>, 2006 WL 825276, at *1.

6        Furthermore, defendants have not shown as they must on a

7   motion to alter or amend a judgment that the "court made a manifest

8   mistake of fact or law[.]"  <u>See</u> <u>id.</u>  Likewise, defendants have not

9   shown, as Rule 59 requires, that the court "committed clear error

10  or made an initial decision [as to the materiality issue] that was

11  manifestly unjust[.]"  <u>See</u> <u>Zimmerman</u>, 255 F.3d at 740.  At the end

12  of the day, defendants' argument is nothing more than a

13  disagreement as to how the court, albeit implicitly, applied the

14  Restatement factors.  This disagreement does not rise to the level

15  of "highly unusual circumstances" so as to justify reopening this

16  judgment, however.  <u>See</u> <u>Kona</u>, 229 F.3d at 890.

17              ***4.  Receivables***

18       Due to "**FINOVA's** foreclosure of AMC's assets and collateral,

19  AMC allege[d] that it was forced out of business[.]" <u>FINOVA II</u>,

20  2006 WL 2547340, at *8.  As outlined in <u>FINOVA II</u>, defendants

21  claimed to have sustained a variety of damages as a result of that

22  foreclosure, including "lost . . . equity in [their] receivables,

23  [and] lost future profits." <u>Id.</u> Although the court did award some

24  types of damages to defendants, it expressly found that there was

25  "an insufficient showing that AMC suffered any lost profits."  <u>Id.</u>

26  at *10, ¶ 24.  Given that lack of proof, the court held that AMC

27  was "not entitled to any damages for *other* alleged lost profits."

28  <u>Id.</u> (emphasis added).

The fourth and final defense argument for altering or amending the judgment is that the court "should have considered and awarded AMC the equity it lost in its collateral upon which FINOVA foreclosed[]" – equity which defendants value at $1,300,968,11. See Mot. (doc. 280) at 15 and 18.  FINOVA counters that "the Court properly determined that AMC failed to establish its lost profits, which necessarily included the profits reflected by the 'equity' in the accounts receivable as of May 2002."  Resp. (doc. 284) at 16 (footnote omitted).  That determination was proper, according to FINOVA, because as the court found, AMC did not establish lost profit damages "with the level of certainty required by law."  Id. Defendants' response is two-fold.  First, defendants maintain that the "lost receivables" are separate damages from those for lost profits.  See Reply (doc. 288) at 7.  Second, defendants believe that in any event they did prove the "lost equity in receivables damages with sufficient certainty."  Id.

Underlying defendants' argument is the assumption that because in its conclusions of law the court in FINOVA II did not specifically mention AMC's receivables, it did not consider whether defendants were entitled to an award of such damages.  This is an understandable, but inaccurate assumption.  To the extent the court contemplated awarding damages other than those discussed in section II(B), ¶¶ 16-23, those damages are subsumed in the reference to "*other* alleged lost profits."  See FINOVA II, 2006 WL 2547340, at *10, ¶ 24 (emphasis added).  Hence, because the court held that there was an "insufficient showing that [defendants] suffered any lost profits[,]" that holding applies with equal force to defendants' claimed damages for lost equity in their receivables."

- 23 -

1   See id.

2       With that clarification, the court notes that as with the

3   other issues which defendants raise on this motion, they are

4   impermissibly seeking to relitigate an issue which they argued

5   unsuccessfully during trial.  Basically defendants are asking this

6   court to reexamine the trial proof as to the equity value of AMC's

7   receivables (i.e. consisting primarily of leases).  As previously

8   discussed, while motions to amend judgments serve a variety of

9   purposes, rehearing the merits of a case is not one of them.

10  Rather, among other things, motions to amend are to correct

11  manifest mistakes of law or fact – neither of which defendants have

12  shown with respect to the receivables issue.  Consequently, the

13  court denies defendants' motion to alter or amend the judgment

14  insofar as it is premised upon the fact that the court did not

15  award defendants damages for the claimed loss of equity in AMC's

16  receivables.

17      To summarize with respect to defendants' motion brought

18  pursuant to Fed. R. Civ. P. 52 and 59, the court denies this motion

19  in its entirety.  Denial is proper because defendants have not met

20  the high threshold which is necessary to warrant altering or

21  amended the judgment under either of those Rules.  Defendants have

22  pointed to no "highly unusual circumstances" which might justify

23  reopening the judgment herein.  See Kona, 229 F.3d at 890.  Nor

24  have they come forth with "substantial reasons[,]" Cohn, 2006 WL

25  825276, at *1, which could be the basis for granting this

26  "extraordinary remedy[.]" See Kona, 229 F.3d at 890.

27  . . .

28

**II.  _Exoneration of Bonds & Vacation of Provisional Attachment_**
**_Order_**

Having denied the parties' post-judgment motions with one corrective exception, there is one final motion which the court must address – FINOVA's motion for exoneration and return of the bonds which it posted in connection with being awarded injunctive relief, and for vacatur of the order granting defendants a writ of prejudgment attachment.  Doc. 268.

Early on in this litigation the court issued three orders granting injunctive relief to FINOVA.  Each of those orders was expressly "conditioned" upon FINOVA filing a bond with the Clerk of the court in accordance with Fed. R. Civ. P. 65©.  On July 19, 2002, FINOVA filed the first of those bonds; this one in the amount of $25,000.00 See Doc. 5.  A few months later, this time in connection with a Supplemental Temporary Restraining Order against defendants, FINOVA filed a second $25,000.00 bond.  See Doc. 25.  A short time later, the court granted FINOVA's motion for a preliminary injunction; this time the court required FINOVA to file, which it did, a $100,000.00 bond.  See Doc. 41.

Several years later, on September 21, 2005, the court denied defendants' application for a Temporary Restraining Order.  Doc. 210.  However, the court did grant defendants' alternative application for a prejudgment writ of attachment pursuant to A.R.S. § 12-1521.  Id. at 12.  As section 12-1524 requires, the court set bond at "$4.5 million."  Id. at 13.

On September 18, 2006, "in anticipation of judgment being entered in the form jointly lodged on September 15, 2006[,]" FINOVA filed a motion for release and exoneration with respect to the

1  three injunction related bonds described above.  Doc. 268 at 1.  As

2  part of this motion FINOVA is seeking to have the Clerk of the

3  Court release the original of those bonds "to a representative of

4  legal counsel for FINOVA[.]"  _Id._ at 2, ¶ (2).  FINOVA is also

5  seeking to have the court vacate its September 21, 2005, order

6  granting a writ of prejudgment attachment (doc. 210).

7      FINOVA's position is that entry of judgment renders the bonds

8  "moot."  Doc. 268 at 3.  Therefore, because two days after the

9  filing of this motion to vacate, etc., on September 20, 2006, the

10  judgment was filed in this action, FINOVA believes that the bonds

11  are moot.  As to the writ of prejudgment attachment, FINOVA asserts

12  that the court should vacate the order granting that relief because

13  the judgment "after all applicable set-offs[] results in FINOVA

14  being awarded a net monetary judgment against Defendants."  _Id._

15  Thus, FINOVA reasons, "there is no remaining claim on the part of

16  Defendants to support an attachment against FINOVA's assets."  _Id._

17      Defendants did not respond directly to any of these arguments.

18  In fact, they did not respond at all with respect to the request to

19  vacate the writ of prejudgment attachment.  As to the three bonds

20  corresponding to FINOVA's injunctive relief, defendants request

21  that the court deny such relief "and retain the bonds _until such_

22  _time_ as [it] rules on Defendants' Rule 52 and 59 post-trial

23  motions."  Doc. 277 at 2 (emphasis added).

24      Because the court has now ruled on defendants' post-trial

25  motions, there is no basis for denying FINOVA's motion to

26  "releas[e] and exonerat[e] FINOVA and its sureties from any and all

27  further liability under the FINOVA Bonds" (doc. 7, 25, and 41).

28  Accordingly, the court hereby grants FINOVA's motion in this

regard( doc. 268).  In addition, because defendants do not object to vacating the writ of prejudgment attachment; and because there is no basis for denying such relief at this time, the court also grants FINOVA's motion to vacate the September 23, 2005 (doc. 215) Order "to the extent that such Order granted Defendants' application for prejudgment attachment against FINOVA."  See Doc. 268 at 3, ¶ C(3).

IT IS HEREBY ORDERED that:

(1) plaintiff FINOVA Capital Corporation's "Motion to Alter or Amend Judgment and to Amend Findings and Conclusions" (doc. 278) is GRANTED in part, to the extent FINOVA is seeking a reduction from $479,213.08 to $363,177.94 as the principal amount awarded against it in paragraph 2 of the Judgment (doc. 269);

(2) FINOVA's motion (doc. 278) is DENIED in all other respects;

(3) "Defendants' Motions for New Trial, to Amend Findings of Fact and Conclusions of Law and to Amend Judgment" (doc. 280) are DENIED;

(4) "Plaintiff's Motion for Order (A) Exonerating Parties Under bonds and (B) Vacating Provisional Attachment Order" (doc. 268) is GRANTED;

(5) The Clerk of the Court shall enter an Amended Judgment consistent with this Order, which shall include an amendment of paragraph 2 of the original judgment indicating that "AMC Shall have and recover from FINOVA the principal amount of $363,177.94," rather than the amount previously indicated of $479,213.08; all calculations in the Amended Judgment shall conform to this $363,177.94 award; and

1    (6) The Clerk of the Court shall release to a representative

2  of legal counsel for FINOVA the originals of each of the FINOVA

3  bonds (docs. 7, 25, and 41).

4    DATED this 29th day of June, 2007.

5

6

7

8  _____
   Robert C. Broomfield

9    Senior United States District Judge

10 Copies to counsel of record

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28